IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br>                      Plaintiff, <br><br>        v. <br><br> LEN A. FAMILANT and <br> PAUL V. GREENE, <br><br>                    Defendants. | No.  1:12-cv-00119-JEB |

## SEC'S OPPOSITION TO DEFENDANT
## GREENE'S MOTION TO DISMISS

H. Michael Semler
District of Columbia Bar No. 162479
Division of Enforcement
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-5546
Telephone: 202-551-4429
E-mail: semlerm@sec.gov

Of Counsel:
Antonia Chion, New York Bar No. 1873405
Lisa Weinstein Deitch, Ca. Bar No. 137492
Ann Rosenfield, D.C. Bar No. 418316
Division of Enforcement
Securities and Exchange Commission

June 11, 2012

## **TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES ........................................................................ i

INTRODUCTION .......................................................................... 1

STATEMENT OF FACTS ....................................................................3

    A. The Round-Trip Scheme............................................................3

        1. The Sham Credits Provided by APC ................................4

        2. InPhonic's Repayment of the Sham Credits ....................5

    B. Impact On InPhonic's Reported Financial Results............................6

LEGAL STANDARD....................................................................7

ARGUMENT ..................................................................8

I. The Complaint States A Claim Against Greene for Engaging In A
   Fraudulent Scheme In Violation of Section 10(b) and Rule 10b-5(a) and (c)................8

    A. Scheme Liability Under Rule 10b-5(a) and (c)......................................9

    B. Greene Engaged In Numerous Inherently Deceptive Acts Distinct From
       InPhonic's False Financial Statements ..................................11

II. The Complaint States A Claim Against Greene For Aiding and Abetting The
    Section 10(b) and Rule 10b-5(a) and (c) Violations By Familant and InPhonic.........14

    A. Greene Aided And Abetted Familant's Scheme Violations ...................14

    B. Greene Aided And Abetted InPhonic's Scheme Violations ...................15

        (i) Familant's Acted As A Senior Company Executive Within The Area
           Of His Designated Responsibilities .................................16

        (ii) Even Where Unauthorized, Familant's Conduct Was Within The
           Scope Of His Employment ..........................................17

        (iii) InPhonic Is A Primary Violator For Purposes Of Greene's Aiding
           And Abetting Liability ...............................................18

III.  The Complaint States Claims Against Greene For Aiding And Abetting
      InPhonic's Reporting and Record-Keeping Violations.............................................19

IV.   The Complaint States A Claim That Greene Caused The Falsification Of
      InPhonic's Books And Records In Violation Of Section 13(b)2-1 ...........................21

CONCLUSION.................................................................................................................23

## TABLE OF AUTHORITIES

### FEDERAL CASES

Affiliated Ute Citizens of Utah v. United States, 406 US 128 (1972 ................................12

Aktieselskabet AF 21 Nov. 2001 v. Fame Jeans, Inc., 525 F.3d 8 (D.C. Cir. 2008)...........7

Ashcroft v. Iqbal, 556 U.S. 662 (2009)..............................................................................7

Atherton v. District of Columbia Office of Mayer, 567 F.3d 672 (2009) ...........................7

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)..........................................................7

In re Blech Securities Litigation, 2002 WL 31356498 (S.D.N.Y. Oct. 17, 2002)..............17

Dodona I, LLC v. Goldman, Sachs & Co., 2012 WL 935815 (S.D.N.Y. March 21, 2012) ............................................................................................................................17

Doe v. Slipper, 821 F. Supp. 2d 384 (D.D.C. 2011)..........................................................17

Dolphin and Bradbury, Inc. v. SEC, 512 F.3d 634 (D.C. Cir. 2008).................................10

Erickson v. Pardus, 551 U.S. 89 (2007).............................................................................7

Garabis v. Unknown Officers, 820 F. Supp. 2d 32 (D.D.C. 2011).......................................7

In re Global Crossing, Ltd. Sec. Litigation, 322 F. Supp. 2d 319 (S.D.N.Y. 2004)......9, 17

Gustave-Schmidt v. Chao, 226 F. Supp. 2d 191 (D.D.C. 2002)...........................................7

Hawaii Ironworkers Annuity Trust Fund v. Cole, 2011 WL 1257756 (N.D. Ohio, 2011) .................................................................................................................................9

Howard v. SEC, 376 F.3d 1136 (D.C.Cir.2004)...............................................................20

In re Lernout & Hauspie Sec. Litigation, 236 F. Supp. 2d 161 (D. Mass. 2003) ........10, 11

Janus Capital Group, Inc. v. First Derivative Traders, 131 Sup. Ct. 2296 (2011).......11, 12

Local 1814, International Longshoremen's Associate v. NLRB, 735 F.2d 1384 (D.C. Cir 1984) .................................................................................................17, 18

Marbury Management, Inc., v. Kohn, 629 F.2d 705 (2d Cir. 1980)..................................17

i

In re Marsh & Mclennan Companies., Inc. Sec. Litigation, 501 F. Supp. 2d 452
    (S.D.N.Y. 2006) ...................................................................................................16

McConville v. SEC, 465 F.3d 780 (7th Cir. 2006) ...........................................................22

Santa Fe Industries, Inc. v. Green, 430 US 462, 97 S.Ct. 1292 (1977) .............................10

SEC v. Brown, 740 F. Supp. 2d 148 (D.D.C. 2010) ...................................................9, 14,19

SEC v. Collins & Aikman, 524 F. Supp. 2d 477 (S.D.N.Y. 2007)....................................22

SEC v. First Jersey Sec., Inc., 101 F.3d 1450 (2d Cir. 1996) ....................................9, 10,12

SEC v. Geswein, 2011 WL 4565898 (N.D. Ohio 2011)...................................................22

SEC v Grendys, 579 F. Supp. 2d 1 (D.D.C., 2008) .....................................................14, 19

SEC v. Grendys, 2012 WL 12266 (D.D.C. 2012) .......................................................20, 21

SEC v. Johnson, 530 F. Supp. 2d 325 (D.D.C. 2008) .....................................................21

SEC v. Kelly, 817 F. Supp. 2d 340 (S.D.N.Y. 2011) ...........................................11, 12, 14

SEC v. Lee, 720 F. Supp. 2d 305 (S.D.N.Y. 2010) .....................................................10, 11

SEC v. Lucent Techs., Inc., 2005 WL 1683741(D.N.J., 2005) ........................................22

SEC v Softpoint, Inc., 958 F. Supp. 846 (S.D.N.Y. 1997), aff'd 159 F.3d 1348 (2nd
    Cir. 1998) ...........................................................................................................22

SEC v. Steadman, 967 F.2d 636 (D.C. Cir. 1992)............................................................10

SEC v. U.S. Environmental, Inc., 155 F.3d 107 (2d Cir. 1998) ....................................9,10

SEC v. World-Wide Coin Investments, Ltd., 567 F. Supp. 724 (N.D. Ga. 1983)..............21

Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148
    (2008)..............................................................................................................9, 12

Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87
    (2d Cir. 2001)......................................................................................................17

U.S. ex rel. Miller v. Bill Harbert International Construction, Inc., 608 F.3d 871
    (D.C. Cir. 2010) .................................................................................................16

United States v. Bilzerian, 926 F.2d 1285 (2nd Cir. 1991) .............................................19

United States v. Finnerty, 533 F.3d 143 (2d Cir. 2008)........................................................9

United States v. Philip Morris USA, Inc., 566 F.3d 1095 (D.C. Cir. 2009) .......................16


## FEDERAL STATUTES AND RULES

Exchange Act of 1934
Section 10(b)..............[15 U.S.C. § 78j(b)]............................................................ passim
Section 12(g) ............ [15 U.S.C. § 78l] ........................................................................4
Section 13(a)..............[15 U.S.C. § 78m(a)]................................................................21
Section 13(b)2-1.........[15 U.S.C. § 78m(b)2-1]..........................................................21
Section 13(b)(2)(A)......[15 U.S.C § 78m(b)(2)(A)] ....................................................20,21
Section 20(e)..............[15 U.S.C. § 78t(e)] ............................................................14, 20


Rule 10b-5 ...............[17 C.F.R. § 240.10b-5] ..............................................................9
Rule 10b-5(a) and (c) ...[17 C.F.R. § 240.10b-5(a) and (c)] .................................. passim
Rule 12(b)(6).............[ 17 C.F.R. § 240.12(b)(6)] ..........................................................1
Rule 12b-20...............[17 C.F.R§ 240.12b-20]............................................................21
Rule 13a-1..................[17 C.F.R§ 240.13a-1]..............................................................21
Rule 13a-11................[ 17 C.F.R. § 240.13a-11].........................................................21
Rule 13a-13................[17 C.F.R. § 240.13a-13]
Rule 13b2-1................[17 C.F.R. § 240.13b2-1] ......................................................3,22,23


Rule 12(d), Fed. R. Civ P ...................................................................................................9
Rule 12(e), Fed.R. Civ. P....................................................................................................9


## MISCELLANEOUS

General Statement, REST 2d AGEN § 228, 1958 WL 57108 (1958) ...............................17

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| v. | No.  1:12-cv-00119-JEB |
| LEN A. FAMILANT and PAUL V. GREENE, | |
| Defendants. | |

<u>**SEC'S OPPOSITION TO DEFENDANT GREENE'S MOTION TO DISMISS**</u>

The Securities and Exchange Commission ("Commission" or "SEC") hereby opposes the

motion to dismiss filed by defendant Paul V. Greene pursuant to Rule 12(b), Fed. Rules Civ. P.[1]

<u>**INTRODUCTION**</u>

This case arises from a scheme to artificially inflate the financial results of InPhonic, Inc.

("InPhonic"), a publicly-owned retailer of wireless telephones.  The Commission alleges that

from late 2005 through early 2007 an InPhonic senior vice president, Len Familant ("Familant"),

and Paul Greene ("Greene"), the president of telephone distributor Americas Premier

Corporation ("APC"), engaged in fraudulent "round-trip" transactions resulting in misstatement

of InPhonic's reported financial results for the third quarter of 2005 and each quarter of 2006.

---

[1]  Defendant Paul V. Greene's Motion To Dismiss The Complaint, Or, In The Alternative, For Summary Judgment, filed May 4, 2012.  <u>See</u> <u>also</u> Memorandum Of Law In Support Of Defendant  Paul V. Greene's Motion To Dismiss The Complaint, Or, In The Alternative, For Summary Judgment, filed May 4, 2012 ("Greene Mem.").  On May 18, 2012, the Court granted the Commission's request to respond separately to Greene's motion to dismiss (by June 11, 2012) and his request for summary judgment (by September 21, 2012).  Minute Order of May 18, 2012.

Complaint ¶ 1.  After each quarter, APC provided InPhonic with sham "credits" that InPhonic used to inflate its reported financial performance.  Id.  APC provided these credits pursuant to an agreement that InPhonic would repay APC by purchasing telephones and repair services at inflated prices, and by paying for fake repairs.  Id.

Greene's motion to dismiss falls far short as to each of the Commission's five claims for relief.  Greene argues that he is not subject to "scheme liability" under Section 10(b) and Rule 10b-5(a) and (c) (the First Claim For Relief) because his conduct was not inherently deceptive and he did not control InPhonic's financial reporting.  Greene Mem. at 8-11.  But the Complaint alleges multiple acts by Greene that were inherently deceptive, including issuing sham "credit memos" and millions of dollars in invoices for services not performed.  Even under the most stringent interpretation of scheme liability, the Complaint states a scheme liability claim against Greene.

Greene contends that he is not liable for aiding and abetting InPhonic's violations of Section 10(b) and Rule 10b-5(a) and (c) (the Second Claim For Relief) because Familant's knowledge and conduct cannot be attributed to InPhonic and, as a result, InPhonic has no primary liability.  Greene Mem. at 11-14.  However, Familant's knowledge and conduct can indeed be attributed to InPhonic because Familant was responsible for InPhonic's procurement matters, was requested by InPhonic's financial department to obtain the credits from APC, and arranged for the credits in order to benefit InPhonic.

Greene also argues that he is not liable for aiding and abetting InPhonic's reporting and record-keeping violations (Third and Fourth Claims For Relief) because he did not have actual knowledge of how InPhonic would treat the sham APC credits.   Greene Mem. at 16-17.  Although actual knowledge is not required for aiding and abetting, the facts alleged show that

Greene did have actual knowledge that InPhonic was improperly reporting the APC credits. Likewise, there is no merit to Greene's claim that he has no aiding and abetting liability because he did not control InPhonic's books.  To satisfy the substantial assistance element, the Commission need allege only that Greene associated himself with the scheme, "participate[d] in it as something he wishe[d] to bring about," and sought to make it succeed.  The facts alleged satisfy that standard.

Finally, Greene argues that he could not have caused the falsification of InPhonic's books in violation of Rule 13b2-1 (Fifth  Claim For Relief) because he was not an InPhonic employee and did not prepare InPhonic's records.  Greene Mem. at 15-16.  But Rule 13b2-1 forbids any person from causing corporate records to be falsified, and direct participation in the creation of the records is not necessary.  It is sufficient that the sham credit memos and fictitious invoices provided to InPhonic at Greene's direction became the basis for false entries in InPhonic's records, as Greene knew they would.

Thus, the facts alleged in the Complaint are sufficient to support each of the Commission's claims and Greene's motion to dismiss must be denied.

## STATEMENT OF FACTS

### A.     The Round-Trip Scheme

InPhonic, Inc., a Delaware corporation headquartered in Washington, D.C., was at one time the largest online retailer of cellular telephones and related services in the United States. Complaint ¶ 11[2]  Familant was InPhonic's Senior Vice President, Procurement, and Senior Vice

---

[2]   InPhonic's common stock was registered with the Commission pursuant to Section 12(g) of the Exchange Act and was traded on the NASDAQ National Market.  InPhonic filed for bankruptcy in November 2007.  Complaint ¶ 11.

President, Supply Chain, and was responsible for InPhonic's vendor relations, including purchasing decisions.  Id. ¶ 9.[3]

Defendant Greene is the president and sole owner of Americas Premiere Corp., a Maryland corporation headquartered in Rockville, Maryland.  Id. ¶¶ 10, 12.[4]  APC began selling telephones, equipment, and repair services to InPhonic by at least 2002, and InPhonic became APC's largest customer.  Id. ¶ 13.

1.      **The Sham Credits Provided by APC**

Third Quarter 2005:  Familant and Greene engaged in a series of fraudulent "round-trip" transactions that resulted in material misstatement of InPhonic's reported financial results.  Id. ¶ 1.  The round-trip scheme began in October 2005 when Familant told Greene that InPhonic wanted a credit from APC.  Id.  ¶ 15.  Familant promised that InPhonic would repay the credit by purchasing goods or services from APC at marked-up prices.  Id.  Greene then instructed an APC employee to email InPhonic a credit memo for $400,525.  The credit memo sent to Familant on October 18, 2005, falsely stated that it was in connection with defective telephone components.  Id. ¶ 16.  After Familant requested a new memo backdated to the prior quarter, Greene directed that a new credit memo be sent to InPhonic, dated "September 12, 2005."  Id.  ¶ 17.

At Familant's request, Greene issued a second credit to InPhonic in October 2005, in the amount of $277,925.  This credit was also provided based on Familant's promise that it would be repaid by InPhonic through the purchase goods or services from APC at marked-up prices.  Id. ¶ 19.

---

[3]   Familant consented to entry of judgment in this action. A final judgment against Familant was entered on January 26, 2012.  The only remaining defendant is Paul Greene.

[4]   APC ceased operations in 2008, but has not been dissolved.  Complaint ¶ 12.

InPhonic improperly recorded the two sham APC credits for the third quarter of 2005 as reductions in the cost of goods sold.  Id. ¶ 20.

2006:  As InPhonic was closing its books after each quarter in 2006, InPhonic's finance department directed Familant to obtain credits from APC in specific amounts.  Id. ¶ 21.  Familant then asked APC to provide a credit in the specified amount and APC did so.  The references in the credit memos to "rebates," "volume bonuses," "volume discounts," and "price protection" were fabricated, and the credits were essentially loans from APC to InPhonic.  Id.   Familant provided the bogus credit memos to InPhonic's finance department, which recorded them as legitimate reductions to expenses.  Id. ¶ 21.   Nine APC credits were recorded by InPhonic in its financial statements for 2006, in the amount of approximately $9.3 million.  Id.

Total Sham Credits:  At Greene's direction, APC issued a total of eleven sham credits that were reported by InPhonic for 2005 or 2006.  These credits totaled over $9.9 million.  Id. ¶ 28.  Greene knew the credits were being used to falsely inflate InPhonic's financial performance.  Id. ¶ 29.

**2.      InPhonic's Repayment Of The Sham Credits**

Greene and Familant agreed on the amounts by which APC would inflate its invoices to recoup the credits.  Id. ¶ 30.  At Greene's direction, an APC employee tracked the credits issued and the amounts returned.  The tracking sheets showed the amounts by which APC was overbilling for telephones, repairs, and fictitious repairs.  Id. ¶ 31.

These tracking sheets were at times provided to Greene.  Id. ¶ 32.  In June 2006 Greene was emailed a tracking sheet showing that APC had overbilled InPhonic $231,880 for telephones and $208,930 for repairs.  Id.  Similarly, in October 2006, an APC employee sent Greene a

tracking sheet showing that as of that date APC had issued credits of $2.9 million and InPhonic had returned more than $1 million.  Id. ¶ 33.

Familant used his position as InPhonic's senior vice president for procurement to ensure that the inflated invoices were paid.  Id. ¶ 35.  Familant directed that all invoices for fictitious work be sent directly to him, to evade scrutiny by others within InPhonic.  Id. ¶ 37.

InPhonic returned an estimated $2.3 million of the bogus credits to APC in 2006 through inflated payments for telephones, repairs, and fictitious repairs.  Id. ¶ 36.  InPhonic returned additional amounts to APC during the first half of 2007.  Id.

**B.**     **Impact On InPhonic's Reported Financial Results**

InPhonic treated the bogus APC credits as legitimate reductions to its expenses.  This was inconsistent with Generally Accepted Accounting Principles ("GAAP") because the credits would not reduce InPhonic's cash outflows since they were to be repaid (and were being repaid).  Id. ¶ 41.

InPhonic's improper accounting for the APC credits materially inflated InPhonic's reported performance for the third quarter of 2005 and throughout 2006, reducing InPhonic's reported losses.  In its original reported financial results, InPhonic understated its net loss by 11% or more for each of these quarters (and for 2006 as a whole), including a 55% understatement for the fourth quarter of 2006.  Id. ¶ 42.  The inflated earnings figures were

included in financial statements submitted as part of six 10-Q and 10-K filings with the

Commission.  Id. ¶ 43.[5]

## LEGAL STANDARD

When considering a motion to dismiss under Rule 12(b)(6), the facts alleged in the

Complaint must be accepted as true and all reasonable inferences from those facts must be drawn

in favor of the plaintiff.  Erickson v. Pardus, 551 U.S. 89, 93 (2007); Atherton v. District of

Columbia Office of Mayer, 567 F.3d 672, 681 (2009); Aktieselskabet AF 21 Nov. 2001 v. Fame

Jeans, Inc., 525 F.3d 8, 15 (D.C. Cir. 2008).

A plaintiff need only plead "enough facts to state a claim to relief that is plausible on its

face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  A claim has facial plausibility

when the plaintiff pleads facts allowing the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

A motion to dismiss must be evaluated on the basis of facts alleged in the complaint.  The

only other documents that may be considered are those referred to or incorporated in the

complaint or subject to judicial notice.  Garabis v. Unknown Officers, 820 F. Supp.2d 32, 34

(D.D.C. 2011); Gustave-Schmidt v. Chao, 226 F.Supp.2d 191,196 (D.D.C. 2002).  This

limitation is important here because Greene's hybrid motion argues for either dismissal or

summary judgment, and is accompanied by exhibits not properly considered in connection with a

motion to  dismiss.  For purposes of Greene's motion to dismiss, the Court must disregard the

exhibits submitted by Greene, including his declaration and the declaration of his accounting

---

[5]   InPhonic subsequently restated its financial statements for three quarters in 2006 to correct for
errors unrelated to the round-trip scheme.  Because the round-trip scheme had not yet been
discovered, InPhonic's restated financial statements continued to be inflated due to the sham
APC credits.  Complaint ¶ 44.  The restated-but-still-inflated results were included in eight
Inphonic filings.  Id. ¶ 45.

expert.  The Court must also disregard those portion of Greene's brief that challenge the facts

alleged in the Complaint or advance arguments based on Greene's own factual assertions.[6]

## ARGUMENT

### I.   The Complaint States A Claim Against Greene for Engaging In A Fraudulent Scheme In Violation Of Section 10(b) and Rule 10b-5(a) and (c)

The Commission's First Claim for Relief alleges that by engaging in the fraudulent

round-trip transactions with InPhonic, Greene employed a "scheme . . . to defraud " in violation

of  subsection (a) of Rule 10b-5 and engaged in an "act, practice, or course of business" that

operated as a fraud in violation of  subsection (c) of Rule 10b-5.  Complaint ¶¶ 51-53.  In short,

the Commission asserts what is widely referred to as "scheme" liability.

Greene argues that he has no scheme liability here because he took no deceptive acts

apart from InPhonic's issuance of false financial statements, which he did not control.  Greene

Mem. at 9.  This misstates the law and ignores the key allegations of the Complaint, which

---

[6]   For example, Greene asserts that InPhonic did not violate GAAP by recognizing the APC credits and that InPhonic's financial statements were not inaccurate or misleading.  Greene Mem. at 17-22, 25-26.  To support those arguments, Greene relies on his own affidavit, the affidavit of an accounting expert, and other exhibits.  Greene Mem. at 20.  Under these circumstances, whether and to what extent InPhonic's accounting was improper cannot be resolved on a motion to dismiss.  For purposes of Greene's motion to dismiss, InPhonic's financial statements must be deemed to have been in violation of GAAP as alleged by the Commission.

   Similarly, Greene argues that any misstatements in InPhonic's financial statements due to the APC credits were "not material" because Inphonic's financial statements contained other, larger errors.  Greene Mem. 22-26.  Here too, Greene relies on affidavits and other exhibits, including figures developed by his accounting expert.  Greene Mem. at 23-24.  In considering Greene's motion to dismiss, the Court must assume, as alleged by the Commission, Complaint ¶ 42, that the misstatements resulting from the sham APC credits were material.

   Rule 12(d), Fed. R. Civ. P., provides that if on a motion under Rule 12(b)(6) matters outside the pleadings are considered, the motion "must" be treated as one for summary judgment."  If the Court believes that Greene's Rule 12(b)(6) arguments are so entwined with his arguments for summary judgment that they cannot be considered separately, the entire motion must be treated as one for summary judgment, and the motion to dismiss denied.

identify multiple inherently deceptive acts by Greene.  The facts alleged are more than sufficient to state a claim for scheme liability.

A.      **Scheme Liability Under Rule 10b-5(a) and (c)**

Section 10(b) of the Securities Exchange Act makes it unlawful, in connection with the purchase or sale of securities, to use "any manipulative or deceptive device or contrivance" in contravention of a rule issued by the Commission for the protection of investors.  15 U.S.C. § 78j(b).  Rule 10b-5 is such a rule, and prohibits three broad and overlapping types of deceptive practices in connection with the purchase or sale of a security: subsection (a) prohibits the use of any "device, scheme, or artifice to defraud;" subsection  (b) prohibits false or misleading statements or omissions; and subsection (c) prohibits "any act, practice, or course of business which operates . . . as a fraud or deceit on any person."  17 C.F.R. § 240.10b-5.

The courts have recognized that subsections (a) and (c) of Rule 10b-5 create "scheme liability."  See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 159 (2008); United States v. Finnerty, 533 F.3d 143, 148 (2d Cir. 2008); SEC v. U.S. Envtl., Inc., 155 F.3d 107, 111-12 (2d Cir. 1998); SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1471-72 (2d Cir. 1996); SEC v. Brown,  740 F.Supp.2d 148, 172 (D.D.C. 2010).

Scheme liability under Rule 10b-5(a) and (c) may be based on deceptive conduct alone. See  SEC v. Brown,  740 F.Supp.2d at 172 ("an individual's participation in a scheme to defraud may result in primary liability even in the absence of a misstatement or manipulative act if the individual "engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme"); Hawaii Ironworkers Annuity Trust Fund v. Cole, 2011 WL 1257756, at *6-8 (N.D. Ohio) ("Conduct can be deceptive and provide a basis for primary liability" under Rule 10b-5(a) and (c)); In re Global Crossing, Ltd. Sec. Litig., 322 F.

Supp. 2d 319, 329 (S.D.N.Y. 2004) ("While claims brought under Rule 10b-5(b) require plaintiffs to allege a false or misleading statement (or omission), "[t]he first and third subparagraphs [of Rule 10b-5] are not so restricted").[7]

Liability under Rule 10b-5(a) and (c) may also arise from participation in a scheme that includes the making of a false public statement or results in such a statement, even if the defendant did not make the public statement.  SEC v. Lee, 720 F. Supp. 2d 305, 334 (S.D.N.Y. 2010) ("Section 10(b) and Rule 10b–5 impose primary liability on any person who substantially participates in a manipulative or deceptive scheme . . . . intended to mislead investors, even if a material misstatement by another person creates the nexus between the scheme and the securities market").  See also In re Lernout & Hauspie Sec. Litig., 236 F. Supp.2d 161, 173 (D. Mass. 2003).

Scheme liability extends to those "who had knowledge of the fraud and assisted in its perpetration."  SEC v. First Jersey Sec., Inc., 101 F.3d at 1471.  See also SEC v. Lee, 720 F. Supp. 2d at 334 ("any person who substantially participates");  SEC v. U.S. Envtl., Inc., 155 F.3d 107 at 155 F.3d at 111 ("a primary violator is one who participated in the fraudulent scheme").   Thus, a defendant is subject to scheme liability under Rule 10b-5(a) and (c) if, acting with scienter,[8] he assists in the perpetration of a deceptive scheme in connection with the purchase or sale of securities.

---

[7]   Liability arises under Rule 10b-5(a) and (c) also for classic market manipulation activities, such wash sales, rigged prices, and matched orders, that do not involve false public statements. See Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 476 (1977).

[8]    To prove scienter, the Commission must show "an intent to deceive, manipulate, or defraud." Dolphin and Bradbury, Inc. v. SEC, 512 F.3d 634, 639 (D.C. Cir. 2008) (quoting SEC v. Steadman, 967 F.2d 636, 641 (D.C. Cir. 1992)).  Extreme recklessness can also satisfy the scienter requirement.  Steadman, 967 F.2d at 641.

**B.      Greene Engaged In Numerous Inherently Deceptive Acts Distinct From InPhonic's False Financial Statements**

Greene argues he has no scheme liability because he did not have ultimate responsibility for InPhonic's public statements and his underlying conduct was not itself deceptive.  Greene is wrong both on the law and on the facts as alleged.

Because the Complaint alleges scheme liability under Rule 10b-5(a) and (c), not false statement liability under Rule 10b-5(b), the Commission need not, and does not, allege that Greene himself "made" the false statements in InPhonic's filings under the standard established in Janus Capital Group, Inc. v.  First Derivative Traders, 131 S. Ct. 2296 (2011).  But the Complaint does allege that Greene substantially assisted in a fraudulent scheme that had as its purpose and effect the inflation of InPhonic's financial statements.  Even if scheme liability could arise only in connection with a false public statement (which is not the law), the Commission's allegations regarding the purpose and effect of the round-trip scheme establish any required nexus.  See  SEC v. Lee, 720 F. Supp. 2d at 334  ("a material misstatement by another person creates the nexus between the scheme and the securities market").  See also In re Lernout & Hauspie Sec. Litig., 236 F. Supp.2d 161, 173 (D. Mass. 2003).

Apart from Janus, Greene relies on a single decision, SEC v. Kelly, 817 F. Supp.2d 340 (S.D.N.Y. 2011), in arguing that there can be no scheme liability here.  Greene Mem. at 8-11. The Commission believes that Kelly was wrongly decided in at least two regards.  First, it mistakenly holds that scheme liability "hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement." SEC v. Kelly, 817 F. Supp.2d  at 344.  But scheme

liability may arise even where the only deceptive conduct is a false public statement.[9]  Second, Kelly mistakenly transfers the "ultimate control" test for Rule 10b-5(b) liability articulated in Janus into the context of scheme liability under Rule 10b-5(a) and (c).  The correct standard for evaluating scheme liability (whether or not the conduct involved a false statement) is whether the defendant "had knowledge of the fraud and assisted in its perpetration."  SEC v. First Jersey Sec., Inc., 101 F.3d at 1471.  Greene's knowing participation in the fraudulent round-trip scheme, when he understood that the scheme would inflate InPhonic's financial statements, satisfies that standard.

Most important here, the Complaint states a scheme liability claim against Greene even under the reasoning adopted in Kelly because Greene engaged in numerous inherently deceptive acts distinct from the Inphonic's public statements.  The ruling in Kelly rested on the finding that the underlying conduct there was not inherently deceptive.  817 F. Supp.2d  at 344 ("this case is not about conduct that is itself deceptive").   On that basis, the court concluded that the defendants in Kelly could not be liable for engaging in a deceptive scheme unless the false public statements could be attributed to them.   By the court's own reasoning, it would not have been necessary to reach the question of responsibility for the false statements if the defendants had engaged in "an inherently deceptive act that is distinct from an alleged misstatement."  817 F. Supp.2d  at 345.

---

[9]  See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. at 158 (recognizing that misrepresentations can be the basis of liability under Rule 10b-5(a) and (c)); Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128 (1972) (liablity under Rule 10b-5(a) and (c) established based solely on misleading statements and omissions).

Here the Commission alleges that Greene did engage in numerous acts that were inherently deceptive.  At Greene's direction, APC issued at least eleven sham documents (the credit memos) ostensibly providing credits to InPhonic when in fact APC did not intend to convey such credits, but expected to have the funds surreptitiously returned.  Complaint ¶¶ 1, 13-28.  These credit memos contained false information regarding the reason for issuing the credit, e.g., references to fictitious defective telephone components, id. ¶ 16, or to fabricated justifications such as "rebates," "volume bonuses," or "price protection," id. ¶¶ 21, 28.  Certain credit memos were deliberately back-dated to create the impression that they were issued during the quarter that had just ended.  Id.  ¶ 17.

Similarly, at Greene's direction, APC submitted numerous inherently deceptive invoices.  In some cases the invoices listed charges for repairs that were never made.  Id.  ¶¶ 30-33, 37.  These invoices were prepared using justifications and figures chosen  to evade detection by InPhonic's accounting department.  Id.  ¶¶ 30-33, 37.  (In contrast, APC's in-house records referred openly to "FRMA," meaning "Fake Return Merchandise Authorization."  Id.  ¶ 33.)  In other cases, the invoices overbilled for cell phones or repair services actually provided.  Id.  ¶ 32-33.  Through these false and deceptive invoices, in 2006 APC recouped at least $2.3 million of its bogus credits.  Id.  ¶ 36.

Greene also deceived InPhonic's auditors.  When asked to confirm InPhonic's 2006 year-end figures for the amounts owed by InPhonic to APC and by APC to InPhonic, Greene directed that the confirmation be signed and returned in his name, concealing the fact that the amounts shown as APC credits consisted largely of  "loans" InPhonic had agreed to repay.  Id.  ¶ 39.

In short, the Complaint alleges that Greene engaged in a multitude of inherently deceptive acts distinct from the false statements issued by InPhonic.  If proven, these facts will

be sufficient to show that Greene assisted in the perpetration of a fraudulent scheme, even under the narrow reasoning in <u>Kelly</u>.

## II.    The Complaint States A Claim Against Greene For Aiding and Abetting The Section 10(b) and Rule 10b-5(a) and (c) Violations By Familant and InPhonic

The Second Claim For Relief alleges that Greene aided and abetted Familant and InPhonic in their participation in the fraudulent round-trip scheme in violation of Section 10(b) and Rule 10b-5(a) and (c).  Pursuant to Section 20(e) of the Exchange Act, whoever "knowingly provides substantial assistance" to another in connection with a violation of the Exchange Act violates the relevant provision "to the same extent as the person to whom such assistance is provided."  15 U.S.C. § 78t(e).  To state an aiding and abetting claim, the Complaint must allege facts showing (i) a violation by a primary wrongdoer; (ii) knowledge of the violation by the aider and abettor; and (iii) substantial assistance by the aider and abettor."  <u>See</u> <u>SEC v. Brown</u>, 740 F. Supp. 2d at 168; <u>SEC v Grendys</u>, 579 F. Supp. 2d 1, 2-7 (D.D.C. 2008) (allowing aiding and abetting claim against a supplier who assisted a fraudulent scheme by providing false audit confirmation letter).

Greene argues that the Commission's allegations are inadequate as to the first of these elements, <u>i.e.</u>, the existence of a primary violation.  But Greene ignores the Commission's claim that Familant committed a primary violation by engaging in the fraudulent scheme.  Further, there is no merit to Greene's argument that Familant's knowledge and conduct cannot be attributed to InPhonic.

## A.    Greene Aided And Abetted Familant's Scheme Violations

The Complaint alleges that Familant engaged in a fraudulent scheme in violation of Section 10(b) and Rule 10b-5(a) and (c).  Complaint ¶¶  3, 52-53, 56.   In support of this claim, the Commission makes detailed factual allegations regarding Familant's position within

InPhonic, his role in initiating and implementing the round-trip scheme, his reasons for doing so, his efforts to conceal the fictitious nature of the credit memos and invoices, and his knowledge and intent.  Id.  ¶¶  1, 9, 14-15, 17, 19, 21-25

Greene never addresses the scheme liability claim against Familant.  Instead, Greene argues as if the Commission were alleging that Familant "made" InPhonic's false financial statements in violation of Rule 10b-5(b).   But the Complaint makes clear that the claims against Familant (as against Greene) are based on scheme liability.  As noted, scheme liability does not require that the defendant have ultimate responsibility for a false statement, particularly where the defendant engaged in inherently deceptive acts separate from the false statement.  Thus, Greene has not shown that the Complaint fails to state a claim for primary liability against Familant.  Further, Greene never addresses the knowledge or "substantial assistance" elements of the claim that he aided and abetted Familant's violation of Rule 10b-5(a) and (c).  As a result, Greene has not shown that the facts alleged are insufficient to support the claim against him for aiding and abetting Familant's primary violation.  Greene's motion to dismiss the Second Claim For Relief must be denied on this ground alone.

**B.**     **Greene Aided And Abetted InPhonic's Scheme Violations**

The Complaint also alleges that InPhonic itself violated Section 10(b) and Rule 10b-5(a) and (c) by, inter alia, engaging in the fraudulent round-trip scheme orchestrated by Familant.  Complaint ¶ 55.  This claim rests on attribution of Familant's conduct and scienter to InPhonic.  Thus, the Second Claim For Relief alleges a primary violation by InPhonic as well as by Familant.

Greene argues that Familant's actions and scienter cannot be attributed to InPhonic because he had no responsibility for InPhonic's financial statements.  Here again, Greene

mistakenly assumes that the violation at issue is the making of a false public statement in violation of Rule 10b-5(b).  But the Inphonic violation relevant to the aiding and claim against Greene is InPhonic's participation in the fraudulent round-trip scheme.  With regard to that violation, Familant's actions and knowledge can indeed be attributed to InPhonic.

       (i)       Familant's Acted As A Senior Company Executive Within The Area Of His Designated Responsibilities                        .

Familant was InPhonic's Senior Vice President of Procurement and Senior Vice President, Supply Chain, and reported directly to InPhonic's chief executive officer and other senior executives.  Complaint ¶ 9.  Familant was responsible for InPhonic's purchasing decisions and his duties included purchasing goods and services from APC.  Id.  ¶ 14.

Familant acted at InPhonic's direction and for InPhonic's benefit in obtaining credits from APC .  Complaint ¶¶ 15, 21 and 23.  As InPhonic was closing its books each quarter, InPhonic's finance department directed Familant to obtain credits from APC in particular amounts.  Complaint ¶ 21.  The credits benefited InPhonic by inflating its earnings figures and enabling it to hit its adjusted EBITDA guidance.  Complaint ¶¶ 41-43, 46.

On these facts, settled law makes clear that Familant's conduct and scienter can be imputed to his employer for purposes of scheme liability.  See, e.g., United States v. Philip Morris USA, Inc., 566 F.3d 1095, 1118 (D.C. Cir. 2009) ("Corporations may be liable for specific intent offenses based on the 'knowledge and intent' of their employees."); U.S. ex rel. Miller v. Bill Harbert Int'l Construction, Inc., 608 F. 3d 871, 901 (D.C. Cir. 2010) ("[C]orporate defendants are charged with constructive knowledge of all material facts their agents and officers learn in the scope of their employment").  While no simple formula governs this issue, courts have readily attributed the scienter of a management-level employees to corporate defendants.  In re Marsh & Mclennan Cos., Inc. Sec. Litig., 501 F. Supp.2d 452, 481 (S.D.N.Y. 2006).

The same attribution principles apply in securities litigation.  Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 100-01 (2d Cir. 2001) (scienter of an agent of a corporate defendant is attributable to the corporation as a primary violator of Section 10(b) and Rule 10b-5); Dodona I, LLC v. Goldman, Sachs & Co., 2012 WL 935815, *12, *22 (S.D.N.Y. March 21, 2012) (scienter of vice presidents in trading group imputed to corporate defendant in scheme liability case); In re Global Crossing, 322 F. Supp. 2d at 344 (scienter of individual employees imputed to auditor in scheme liability case).

(ii)    Even Where Unauthorized, Familant's Conduct Was Within The
        Scope Of His Employment

An employer may be liable for unauthorized (and even unlawful) conduct carried out within the scope of an employee's employment.  See Doe v. Slipper, 821 F. Supp. 2d 384, 387-88 (D.D.C. 2011); Local 1814, International Longshoremen's Assoc. v. NLRB, 735 F.2d 1384, 1395-96 (D.C. Cir 1984).

The District of Columbia follows the Restatement (Second) of Agency (1957) ('Restatement") in defining the scope of employment.  Id. at 388.  The Restatement has also been relied on in the context of securities violations.  See Marbury Management, Inc., v. Kohn, 629 F. 2d 705, 716 (2d Cir. 1980); In re Blech Securities Litigation, 2002 WL 31356498, at * 22 (S.D.N.Y. Oct. 17, 2002).  Under the Restatement, Familant's dealings with Greene and APC were within the scope of his employment.  He was acting at the direction of the finance department in obtaining the credits and within his designated sphere of responsibility.  See Restatement § 228.  There is no allegation that Familant profited personally from the round-trip transactions.  His actions accomplished InPhonic's objective, which was to bolster its financial results in the quarters just ended.  Id. § 236 & comment b, at 523-24 ("If the purpose of serving

the master's business actuates the servant to any appreciable extent, the master is subject to liability").

Under these circumstances, the fact that aspects of Familant's dealings with APC were unauthorized does not place his conduct outside the scope of employment.  Even "patent illegality" in pursuing the employer's goals is "immaterial" to the scope of employment issue. See Local 1814, International Longshoremen's Association, 735 F.2d at 1395-96 (kickback arrangement between union officers and employer which was part of an agreement to extend union representation was within the union officers' scope of employment, and could be imputed to the union, because the union benefitted).

     (iii)    InPhonic Is A Primary Violator For Purposes Of Greene's Aiding And Abetting  Liability

Greene's challenge to the Second Claim for Relief consists largely of an effort to characterize InPhonic's liability as "secondary" rather than "primary."  According to Greene, any responsibility an employer may have pursuant to respondeat superior for unauthorized actions by an employee is deemed secondary liability.  Greene Mem. 11-14.  On this basis, Greene argues that he has no aiding and abetting liability as to InPhonic because InPhonic was not a primary violator.

Greene confuses the terminology of respondeat superior with the terms used in aiding and abetting claims under Section 20(e) of the Exchange Act.  For purposes of an aiding and abetting claim, the party whose violation is aided and abetted is referred to as the primary violator and that party's violation is referred to as the primary violation.  The act of aiding and abetting is referred to as a secondary violation.  These terms simply identify the relative positions of the parties.  Contrary to Greene's suggestion, the violation that was aided and abetted (the primary violation) need not be based solely on the personal conduct of the primary violator, but can arise

from the actions by others that are attributable to the primary violator.  In cases alleging that an individual aided and abetted a securities violation by a corporation, the corporation's liability is routinely based on <u>respondeat</u> <u>superior</u>.  <u>See</u> <u>SEC v. Brown</u>, 740 F. Supp. 2d at 168 (denying motion to dismiss claim that individual aided and abetted violation by the company where the company's liability was based on conduct by its executives); <u>SEC v Grendys</u>, 579 F. Supp. 2d at 2-3, 5-7.

In sum, Familant's inherently deceptive conduct and his scienter are attributable to InPhonic, making InPhonic liable under the scheme liability provisions.  Thus, the Complaint adequately alleges a primary violation by InPhonic.  Greene's motion does not dispute that the Complaint adequately alleges that he had the requisite knowledge and provided substantial assistance in the fraudulent scheme.  As a result, Greene has not shown that the Complaint fails to state a claim for aiding and abetting InPhonic's violations of Rule 10b-5(a) and (c).

### III.     The Complaint States Claims Against Greene For Aiding and Abetting InPhonic's Reporting and Record-Keeping Violations

The Commission's Third Claim For Relief alleges that Greene aided and abetted InPhonic's violations of its obligations to file accurate financial statements. Complaint ¶¶ 60-65. Section 13(a) of the Exchange Act and Rules 13a-1 and 13a-13 require that publicly-held companies file accurate annual and quarterly reports, while Rule 13a-11 requires accurate reports on current developments.  Rule 12b-20 requires that all such reports contain the information necessary to make them not misleading.  <u>See</u> <u>generally</u> <u>United States v. Bilzerian</u>, 926 F.2d 1285, 1298 (2nd Cir. 1991).  The Complaint alleges that InPhonic violated these provisions by filing financial statements that were false and misleading as a result of the fraudulent round-trip transactions.  Complaint ¶¶ 20, 41-43.

The Fourth Claim For Relief alleges that Greene aided and abetted InPhonic's violations

of its obligation to maintain accurate books and records.  Complaint ¶¶ 66-71.  Section

13(b)(2)(A) of the Exchange Act requires issuers to "make and keep books, records, and

accounts, which, in reasonable detail, accurately and fairly reflect the transactions and

dispositions of the assets of the issuer."  InPhonic violated this provision by recording the bogus

APC credits as actual reductions in expenses.  Complaint ¶¶ 20, 41.[10]

     In seeking dismissal of these claims, Greene does not dispute that InPhonic committed

the reporting and record-keeping violations.  Instead, Greene argues that the Complaint does not

allege that he had actual knowledge of how InPhonic would treat the sham APC credits.  Greene

Mem. at 16.  The Commission need not show actual knowledge to state a claim for aiding and

abetting.  SEC v. Grendys, 2012 WL 12266, at *7.  It is sufficient if the aider and abettor had a

"general awareness that his role was part of an overall activity that was improper." Grendys, 579

F. Supp. 2d at 6.  "General awareness" can be established through a showing of "extreme

recklessness," such as when the aider and abettor encountered "red flags" or "suspicious events

creating reasons for doubt'," but failed to make the necessary inquiry.  Howard v. SEC, 376 F.3d

1136, 1143 (D.C.Cir.2004).

     Further, although not required, the Complaint does allege that Greene had actual

knowledge that InPhonic was improperly reporting the APC credits.  The Commission has

alleged that Greene knew not only that InPhonic was using the credits to inflate its financial

performance, Complaint ¶¶ 29, 40, 47-49, but also that Greene identified the specific line items

in Phonic's financial statements that were affected by InPhonic's improper treatment of the

---

[10]   The reporting and record-keeping violations by InPhonic that were aided and abetted by
Greene as alleged in the third and fourth claims for relief are non-scienter violations.  The
Commission need not show that InPhonic had knowledge of the round-trip scheme to establish
InPhonic's violations of its reporting and record-keeping requirements.

credits.  Complaint ¶ 29.  The Complaint alleges that Greene actually showed an APC employee

the portions of InPhonic's financial statement at issue (relating to the cost of goods sold) and

explained that APC's credits helped improve InPhonic's reported performance for those entries.

Id.

        Greene also argues that the Complaint fails to adequately allege that he substantially

assisted in InPhonics reporting and record-keeping violations because he was not responsible for

InPhonic's books and had no control over them.  Greene Mem. at 15-16.  To address the

substantial assistance element, the Commission must allege only that the defendant "associate[d]

himself with the venture, that he participate[d] in it as something that he wished[d] to bring

about, that he [sought] by his action to make it succeed."  Grendys, 2012 WL 12266, at *8.  The

primary violation must be a "direct or reasonable foreseeable result" of the aider and abettor's

conduct.  SEC v. Johnson, 530 F. Supp. 2d 325, 337 (D.D.C. 2008).  By this standard, the facts

alleged in the Complaint are more than sufficient to show that Greene substantially assisted in

InPhonic's reporting and record-keeping violations.

### IV.    The Complaint States A Claim That Greene Caused The Falsification Of InPhonic's Books And Records In Violation Of  Section 13(b)2-1

        In the Fifth Claim For Relief, the Commission alleges that Greene caused the falsification

of InPhonic's books and records in violation of Exchange Act Rule 13(b)2-1.  Complaint ¶¶ 72-

75.  Rule 13(b)2-1 provides that "[n]o person" shall directly or indirectly "falsify or cause to be

falsified any books, record, or account" that must be maintained pursuant to Section 13(b)(2)(A)

of the Exchange Act.  17 C.F.R. § 240.13b2-1.  Section 13(b)(2)(A) covers essentially all

corporate financial records: "[V]irtually any tangible embodiment of information made or kept

by an issuer is within the scope of section 13(b)(2)(A)." SEC v. World-Wide Coin Investments,

Ltd., 567 F. Supp. 724, 748 (N.D. Ga. 1983).

Scienter is not required to violate Rule 13b2-1.  McConville v. SEC, 465 F.3d 780, 789 (7th Cir. 2006); SEC v Softpoint, Inc., 958 F. Supp. 846, 865-66 (S.D.N.Y. 1997), aff'd 159 F.3d 1348 (2nd Cir. 1998) ("there is no scienter requirement"). Any unreasonable conduct resulting directly or indirectly in the falsification of corporate records falls within the scope of Rule 13b2-1.  SEC v. Softpoint, 958 F. Supp. at 866.

To state a claim against Greene under Rule 13b2-1, the Commission need only allege that he contributed to InPhonic's issuance of materially misleading financially statements.  SEC v. Collins & Aikman, 524 F. Supp. 2d 477, 497 (S.D.N.Y. 2007) (denying motion to dismiss Rule 13b2-1 claim involving fraudulent round-trip scheme).  See also SEC v. Geswein, 2011 WL 4565898, at *22-23 (N.D. Ohio); SEC v Lucent Techs., Inc., 2005 WL 1683741, at *2 (D.N.J.).

Greene argues that he could not have violated Rule 13b2-1 because he was not an InPhonic employee.   But the plain language of the rule forbids any person from directly or indirectly falsifying or causing to be falsified corporate records.   Rule 13b2-1 "is not limited to corporate officers or employees."  Softpoint, 958 F. Supp. at 865-66.

There is likewise no merit to Greene's argument that he could not have violated Rule 13b2-1 because he did not participate in preparing InPhonic's books and records.  Actual participation in the creation or maintenance of the records at issue is not necessary for Rule 13b2-1 liability.  It is sufficient if the defendant contributed, directly or indirectly, to the falsification of the corporate accounts.  Collins & Aikman, 524 F. Supp. 2d at 497.  The sham credit memos that APC provided to InPhonic, at Greene's direction, became the basis for false entries in InPhonic's books and records, as Greene knew they would.   The false invoices submitted at Greene's direction likewise resulted in incorrect entries in InPhonic's records relating to InPhonic's expenses.  Consequently, the facts alleged in the Complaint, if proven,

would establish that Greene contributed to falsifications of InPhonic's records and thereby

violated Rule 13b2-1.

## <u>CONCLUSION</u>

Wherefore, the Commission requests that Greene's motion to dismiss be denied.

Dated: June 11, 2012

Respectfully submitted,

<u>/s/ H. Michael Semler</u>
H. Michael Semler
District of Columbia Bar No. 162479
Division of Enforcement
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-5546
Telephone: 202-551-4429
E-mail: semlerm@sec.gov
Attorney for Plaintiff

<u>Of Counsel:</u>
Antonia Chion, New York Bar No. 1873405
Lisa Weinstein Deitch, Ca. Bar No. 137492
Ann Rosenfield, D.C. Bar No. 418316
Division of Enforcement
Securities and Exchange Commission

## CERTIFICATE OF SERVICE

I certify that on June 11, 2012, I served the foregoing OPPOSITION OF THE

SECURITIES AND EXCHANGE COMMISSION TO DEFENDANT GREENE'S MOTION

TO DISMISS by filing it electronically with the Clerk of the Court via the CM/ECF system,

which will provide notice thereof to the following counsel for defendant Paul Greene:

Gregory T. Lawrence
Conti Fenn & Lawrence
36 South Charles Street, Suite 2501
Baltimore, Maryland 21201


/s/ H. Michael Semler