**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br><br>                v.<br><br>LEN A. FAMILANT and PAUL V. GREENE,<br><br>        Defendants. | Civil Action No. 12-119 (JEB) |

<u>**MEMORANDUM OPINION**</u>

    Though little remembered now, InPhonic was once the largest online retailer of cell phones and related services in the United States.  In this civil-enforcement action, the Securities and Exchange Commission alleges that a senior vice president of InPhonic, Defendant Len Familant, and the president of an InPhonic supplier, Defendant Paul Greene, ran a scheme to conceal InPhonic's deteriorating financial state:  Greene directed his employees to issue unearned memos of credit to InPhonic, which used the sham credits to pad its financial reports, and then, acting through Familant, repaid Greene's company through a stream of hidden disbursements that ranged from inflated contract prices to outlays for fictitious repairs. According to the SEC, Familant and Greene's scheme violated Sections 10(b) and 13 of the Securities Exchange Act of 1934, along with an array of associated SEC regulations.  This Court, with Familant's consent, previously entered final judgment against him alone.  Greene has now moved to dismiss the Complaint for failure to state a claim or, in the alternative, for pre-discovery summary judgment.  Because the Court disagrees with Greene's legal contentions, it will deny his Motion.

1

**I.      Background**

Because Greene's Motion is primarily a motion to dismiss, the Court draws the facts

from the Complaint, assuming them to be true at this stage.

A.   Factual Background

InPhonic, Inc. sold wireless service plans, cell phones, and accessories over the Internet.

See Compl., ¶ 11.  Its stock was publicly traded on the NASDAQ stock market, and by 2005 its

annual revenue topped $300 million.  See id.; InPhonic, Inc., Annual Report (Form 10-K) at 30

(June 1, 2007), available at http://www.sec.gov/edgar.shtml.

Len Familant served as InPhonic's Senior Vice President of Procurement and InPhonic's

Senior Vice President of Supply Chain.  See Compl., ¶ 9.  He reported to InPhonic's CEO and

other senior executives.  See id.  As his titles suggest, Familant oversaw purchasing decisions

and maintained relationships with vendors.  See id.

One such vendor was America's Premiere Corp., which was wholly owned and

controlled by President Paul Greene.  See id., ¶¶ 10, 12.  APC repaired cell phones and

distributed cell phones and equipment.  See id., ¶ 12.  APC's largest customer was InPhonic.

See id., ¶ 13.  In that customer relationship, Greene dealt with Familant.  See id., ¶ 14.

According to the Complaint, Familant and Greene carried out their alleged scheme

between October 2005 and November 2007.  In broad strokes, APC (through Greene) would

award credit to InPhonic based on an invented reason, and then InPhonic (through Familant)

would gradually repay APC by sending small payments for similarly bogus reasons.  InPhonic

accountants, in the dark as to the arrangement, would record the credits as reductions to

expenses, thus inflating the company's performance.  Now filling in the details of this sketch:

Familant would first ask APC to give InPhonic a particular amount of credit.  See id., ¶¶ 15, 19, 21, 23.  An APC employee, at Greene's direction, would comply, sending Familant a memo stating that APC owed InPhonic the requested amount of credit.  See id., ¶¶ 16, 19, 26. The credit memo would give a fake reason for the credit, such as defective components, repairs, or billing errors.  See id., ¶¶ 16, 21, 28.  For example, the first October 2005 credit memo (backdated to September 2005) declared that InPhonic had $400,525 in credit with APC in connection with defective batteries, housings, LCDs, and chargers.  See id., ¶ 28.

Familant would then find ways for InPhonic to repay the credit.  For example, APC would send (and InPhonic would pay) invoices for repairs that had never happened.  See id., ¶¶ 23, 30, 33.  Or InPhonic would buy goods and services from APC at marked-up prices.  See id., ¶¶ 15, 19, 25, 30, 32-33, 35.  Or InPhonic would send APC functioning phones, characterize them as beyond repair, and allow APC to resell the phones to other customers.  See id., ¶ 25.

Realizing the goal of this arrangement, InPhonic accountants would record the APC credits as reductions to expenses.  See id., ¶¶ 22, 41.  InPhonic's financial statements filed with the SEC reflected this false accounting.  See id., ¶¶ 42-46.  Credit from APC, however, did not in fact reduce actual or expected cash outlays by InPhonic because each credit would have to be repaid; every $1 in credit from APC was offset by a new $1 in obligation to APC, so overall InPhonic was in the same position.  See id., ¶ 41.  In other words, while present expenses may have appeared rosier to Wall Street, the bill would eventually come due.  For the time being at least, InPhonic accountants – indeed, everyone at InPhonic besides Familant – seem to have been unaware that the credits were fabrications, offset by other obligations.

All told, APC issued 11 such credit memos to InPhonic between October 2005 and February 2007 for a total of $9.99 million.  See id., ¶ 28.  Those credits were recorded in the

third quarter of 2005 and each quarter of 2006, inflating financial performance in each of those quarters.  See id.  Because of the APC credits, InPhonic released twenty-three erroneous reports or documents: six Forms 10-Q, six amended Forms 10-Q, two Forms 10-K, one amended Form 10-K, two Forms 8-K, and six EBITDA (earnings before interest, taxes, depreciation, and amortization) releases attached to Forms 8-K.  See id., ¶¶ 43, 45-46.

The SEC estimates that the APC credit arrangement allowed InPhonic to understate its originally reported net losses as follows: in 2005 Q3, InPhonic reported a net loss of $5.0 million instead of $5.6 million; in 2006 Q1, $3.9 million instead of $4.4 million; in 2006 Q2, $5.3 million instead of $6.3 million; in 2006 Q3, $4.8 million instead of $6.0 million; and in 2006 Q4, $3.5 million instead of $7.8 million.  See id., ¶ 42.  Summing those four 2006 quarters, the originally reported net loss for 2006 ($17.5 million) was $7 million smaller than it should been ($24.5 million) – meaning that net losses would have been 40% higher than originally reported. See id.  Because of other pervasive accounting errors unrelated to the APC credits, in June 2007 InPhonic restated its 2006 financial results, increasing its reported losses substantially.  See id., ¶ 44.  The APC arrangement was still hidden, so it continued to buoy InPhonic's reported results. See id.  The SEC still estimates that the 2006 net loss reported in the restated results ($63.7 million) was $7 million smaller than it should have been ($70.7 million) – meaning that actual net losses should have been 11% higher than restated.  See id.  The APC credits also overstated InPhonic's EBITDA figures.  With the APC credits, InPhonic consistently reached its projected EBITDA in Q3 2005 and each quarter of 2006.  See id., ¶ 46.  Without the credits, InPhonic would have missed its EBITDA projection in each of those quarters.  See id.

The allegations make clear that both Familant and Greene knew that their arrangement was illegal.  An APC accountant warned Greene that billing for phony services was "fraud."  Id.,

¶ 24.  Greene also told APC employees that the sham credits were the reason for InPhonic's positive results.  See id., ¶ 29.  An APC employee sent Familant and Greene a tracking sheet that showed, in October 2006, the total credits APC had issued and the total InPhonic had repaid in inflated bills and fake invoices.  See id., ¶ 33.  Greene told APC employees to vary the amount of the overcharges in the fake invoices and to avoid round numbers so as to evade detection.  See id., ¶ 37.  Familant told APC employees to send the invoices for fake work directly to him and to never put anything in writing.  See id., ¶¶ 37-38.

As foreshadowed by its massive financial restatements, InPhonic was ailing by 2007.  In November 2007, it ceased operations and sought bankruptcy protection, bringing the APC credit arrangement to a close.  See id., ¶ 50.  APC never fully recouped the credits.  See id., ¶¶ 47-49.

B. Procedural Background

The SEC brought this civil-enforcement Complaint in January 2012 against Familant and Greene, setting out five causes of action.  Familant consented to – and this Court entered – a final judgment that enjoined further violations, prohibited Familant from acting as an officer or director of any issuer of registered securities, and imposed a $50,000 civil penalty.  See Final J. as to Def. Len A. Familant, Jan. 26, 2012.

Greene, however, is fighting the charges.  He has now moved to dismiss the Complaint for failure to state a claim.  In the alternative, and before full discovery, he has also moved for summary judgment.  This Court allowed the SEC to respond to the Motion to Dismiss and the Motion for Summary Judgment separately so that it could obtain an expert to counter Greene's expert report.  See Minute Order, May 18, 2012.  In the interim, the Court stayed discovery.  See Minute Order, July 10, 2012.  Briefing on both matters having been completed, the issues are now ripe for decision.

II.     **Legal Standard**

A.  <u>Motion to Dismiss</u>

Under Federal Rule of Civil Procedure 12(b)(6), a court must dismiss a claim for relief

when the complaint "fail[s] to state a claim upon which relief can be granted."  In evaluating a

motion to dismiss, the Court must "treat the complaint's factual allegations as true and must

grant plaintiff the benefit of all inferences that can be derived from the facts alleged."  <u>Sparrow</u>

<u>v. United Air Lines, Inc.</u>, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (citation and internal quotation

marks omitted); <u>see also</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009).  A court need not accept as

true, however, "a legal conclusion couched as a factual allegation," nor an inference unsupported

by the facts set forth in the complaint.  <u>Trudeau v. FTC</u>, 456 F.3d 178, 193 (D.C. Cir. 2006)

(quoting <u>Papasan v. Allain</u>, 478 U.S. 265, 286 (1986)).  Although "detailed factual allegations"

are not necessary to withstand a Rule 12(b)(6) motion, <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S.

544, 555 (2007), "a complaint must contain sufficient factual matter, [if] accepted as true, to

state a claim to relief that is plausible on its face."  <u>Iqbal</u>, 556 U.S. at 678 (internal quotation

omitted).  Though a plaintiff may survive a Rule 12(b)(6) motion even if "recovery is very

remote and unlikely," the facts alleged in the complaint "must be enough to raise a right to relief

above the speculative level."  <u>Twombly</u>, 550 U.S. at 555-56 (quoting <u>Scheuer v. Rhodes</u>, 416

U.S. 232, 236 (1974)).

A motion to dismiss under Rule 12(b)(6) must rely solely on matters within the

pleadings, <u>see</u> Fed. R. Civ. P. 12(d), which includes statements adopted by reference as well as

copies of written instruments joined as exhibits.  <u>See</u> Fed. R. Civ. P. 10(c).  Where the Court

must consider "matters outside the pleadings" to reach its conclusion, a motion to dismiss "must

be treated as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d); <u>see also</u> <u>Yates v.</u>

<u>District of Columbia</u>, 324 F.3d 724, 725 (D.C. Cir. 2003).

      B.  <u>Motion for Summary Judgment</u>

      Summary judgment may be granted if "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a); <u>see also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986); <u>Holcomb v.</u>

<u>Powell</u>, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the

substantive outcome of the litigation.  <u>See</u> <u>Liberty Lobby</u>, 477 U.S. at 248; <u>Holcomb</u>, 433 F.3d at

895.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party.  <u>See</u> <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007); <u>Liberty Lobby</u>, 477

U.S. at 248; <u>Holcomb</u>, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely

disputed must support the assertion" by "citing to particular parts of materials in the record" or

"showing that the materials cited do not establish the absence or presence of a genuine dispute,

or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P.

56(c)(1).

      When a motion for summary judgment is under consideration, "[t]he evidence of the non-

movant[s] is to be believed, and all justifiable inferences are to be drawn in [their] favor."

<u>Liberty Lobby</u>, 477 U.S. at 255; <u>see also</u> <u>Mastro v. PEPCO</u>, 447 F.3d 843, 850 (D.C. Cir. 2006);

<u>Aka v. Wash. Hosp. Ctr.</u>, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (<i>en banc</i>).  On a motion for

summary judgment, the Court must "eschew making credibility determinations or weighing the

evidence."  <u>Czekalski v. Peters</u>, 475 F.3d 360, 363 (D.C. Cir. 2007).

      The nonmoving party's opposition, however, must consist of more than mere

unsupported allegations or denials and must be supported by affidavits, declarations, or other

competent evidence, setting forth specific facts showing that there is a genuine issue for trial.

See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The nonmovant is

required to provide evidence that would permit a reasonable jury to find in its favor.  Laningham

v. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  If the nonmovant's evidence is "merely

colorable" or "not significantly probative," summary judgment may be granted.  Liberty Lobby,

477 U.S. at 249-50.

## III.    Analysis

The SEC may bring a civil-enforcement action under Section 21(d) of the Exchange Act

"[w]henever it shall appear to the Commission that any person is engaged or is about to engage

in acts or practices constituting a violation of any provision of this chapter [or] the rules or

regulations thereunder."  15 U.S.C. § 78u(d)(1).  Remedies for such violations include monetary

penalties, injunctions, and other appropriate equitable relief.  See 15 U.S.C. § 78u(d)(1), (3), (5).

The SEC may go after aiders and abettors, too.  After the Supreme Court ruled in Central

Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164 (1994), that Section

10(b) does not create liability for those who aid and abet violations, the Private Securities

Litigation Reform Act of 1995 gave the SEC authority to prosecute the aiding and abetting of

securities-law violations under Section 20(e) of the Exchange Act.  See Pub. L. No. 104-67,

§ 104, 109 Stat. 737, 757 (codified as amended at 15 U.S.C. § 78t(e)).  Under that authority, "any

person that knowingly or recklessly provides substantial assistance to another person in violation

of a provision of this chapter, or of any rule or regulation issued under this chapter, shall be

deemed to be in violation of such provision to the same extent as the person to whom such

assistance is provided."  15 U.S.C. § 78t(e).

Three principal elements are required to establish aiding-and-abetting liability: "(1) that a principal committed a primary violation; (2) that the aider and abettor provided substantial assistance to the primary violator; and (3) that the aider and abettor had the necessary 'scienter' – i.e., that she rendered such assistance knowingly or recklessly." Graham v. SEC, 222 F.3d 994, 1000 (D.C. Cir. 2000). "[D]raw[ing] guidance from the well-developed law of aiding and abetting liability in criminal cases," the Second Circuit has set forth a combined test for substantial assistance and *scienter*:

> [T]he Government – in addition to proving that the primary violation occurred and that the defendant had knowledge of it . . . – must also prove "that he in some sort associated himself with the venture, that the defendant participated in it as in something that he wished to bring about, and that he sought by his action to make it succeed."

SEC v. Apuzzo, 689 F.3d 204, 212 (2d Cir. 2012) (brackets omitted) (quoting United States v. Peoni, 100 F.2d 401, 402 (2d Cir. 1938) (L. Hand, J.)). The D.C. Circuit applied the same test before Central Bank of Denver and the adoption of Section 20(e). See Zoelsch v. Arthur Andersen & Co., 824 F.2d 27, 35-36 (D.C. Cir. 1987), abrogated on other grounds by Morrison v. Nat'l Austl. Bank Ltd., 130 S. Ct. 2869 (2010).

In this case, the SEC sets out five counts against Greene: (I) violations of Section 10(b) and Rules 10b-5(a) and (c); (II) aiding and abetting violations of Section 10(b) and Rules 10b-5(a) and (c); (III) aiding and abetting violations of Section 13(a) and Rules 12b-20, 13a-1, 13a-11, and 13a-13; (IV) aiding and abetting violations of Section 13(b)(2)(A); and (V) violations of Rule 13b2-1. See Compl., ¶¶ 51-75. The Court will first review Greene's arguments specific to Counts I and II, next move to those concerning Counts III, IV, and V, and then close with Greene's general summary-judgment arguments that apply to all five.

A.  <u>Anti-Fraud Provisions: Counts I and II</u>

Count I alleges that Greene directly violated Section 10(b) and Rules 10b-5(a) and (c),

while Count II alleges that he aided and abetted Familant's and InPhonic's violations of this

statute and these Rules.  The Court will begin by setting out the legal framework that governs

here, describing how Section 10(b) and Rule 10b-5 generally operate.  A separate analysis of

each of the two counts follows.

1.  *Legal Framework*

Section 10(b) of the Exchange Act prohibits securities fraud:

> It shall be unlawful for any person, directly or indirectly, by
> the use of any means or instrumentality of interstate commerce or
> of the mails, or of any facility of any national securities exchange
> . . . [t]o use or employ, in connection with the purchase or sale of
> any security registered on a national securities exchange or any
> security not so registered, or any securities-based swap
> agreement[,] any manipulative or deceptive device or contrivance
> in contravention of such rules and regulations as the Commission
> may prescribe as necessary or appropriate in the public interest or
> for the protection of investors.

15 U.S.C. § 78j.  The primary rule that the SEC has "prescribe[d]" to implement Section 10(b) is

Rule 10b-5:

> It shall be unlawful for any person, directly or indirectly, by
> the use of any means or instrumentality of interstate commerce, or
> of the mails or of any facility of any national securities exchange,
>  (a) To employ any device, scheme, or artifice to defraud,
>  (b) To make any untrue statement of a material fact or to
> omit to state a material fact necessary in order to make the
> statements made, in the light of the circumstances under which
> they were made, not misleading, or
>  (c) To engage in any act, practice, or course of business
> which operates or would operate as a fraud or deceit upon any
> person,
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

Because Congress sets the outer bounds on the SEC's rulemaking authority, "Rule 10b-5 encompasses only conduct already prohibited by § 10(b)." Stoneridge Inv. Partners v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008). For a claim to survive, therefore, a defendant's alleged conduct must both fall within the scope of Section 10(b)'s coverage and be prohibited by Rule 10b-5. See Central Bank of Denver, 511 U.S. at 172 ("In our cases addressing § 10(b) and Rule 10b-5, we have confronted two main issues. First, we have determined the scope of conduct prohibited by § 10(b). Second, in cases where the defendant has committed a violation of § 10(b), we have decided questions about the elements of the 10b-5 private liability scheme . . . .") (citations omitted).

Section 10(b) limits the SEC to proscribing the use of a "manipulative or deceptive device or contrivance." "Manipulative," under the statute, is a "term of art" that "refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 476-77 (1977). The most common forms of "deceptive device or contrivance," conversely, are omissions by someone who has a duty to disclose and misstatements. But the Supreme Court has recently warned against limiting the statutory term "deceptive" to "specific oral or written statement[s]" because "[c]onduct itself can be deceptive." Stoneridge, 552 U.S. at 158; see also Ernst & Ernst v. Hochfelder, 425 U.S. 185, 203 (1976) ("The section was described rightly as a 'catchall' clause to enable the Commission to deal with new manipulative or cunning devices.") (some internal quotation marks and brackets omitted); Superintendent of Ins. of N.Y. v. Bankers Life & Cas. Co., 404 U.S. 6, 11 n.7 (1971) ("'We do not think it sound to dismiss a complaint merely because the alleged scheme does not involve the type of fraud that is usually associated with the sale or purchase of securities. We believe that § 10(b) and Rule 10b-5

prohibit <u>all</u> fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception. Novel or atypical methods should not provide immunity from the securities laws.'") (quoting <u>A.T. Brod & Co. v. Perlow</u>, 375 F.2d 393, 397 (2d Cir. 1967)) (emphasis in original; some internal quotation marks and brackets omitted).

To fall within Section 10(b), the deception must be material. "[T]o fulfill the materiality requirement there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." <u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 231-32 (1988) (internal quotation marks omitted). Whether a deceptive act is material "depends on the facts and thus is to be determined on a case-by-case basis." <u>Id.</u> at 250.

As to Rule 10b-5, the elements of such a cause of action depend on who brings suit. An SEC civil-enforcement suit requires the SEC to show that the defendant "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." <u>SEC v. Monarch Funding Corp.</u>, 192 F.3d 295, 308 (2d Cir. 1999). "[U]nlike a plaintiff in a private damages action, the SEC need not prove actual harm." <u>Graham</u>, 222 F.3d at 1001 n.15.

2.  *Motion to Dismiss Count I*

To state a claim for violating Section 10(b) and Rules 10b-5(a) and (c), therefore, Count I must satisfy both the statute and the regulation. As a result, an SEC enforcement action under Rule 10b-5 could suffer from a variety of defects, including a failure to properly allege *scienter* or materiality, a failure to allege a fraud "in connection with the purchase or sale of any security," or a failure to meet the heightened pleading standards imposed by Federal Rule of

Civil Procedure 9(b).  Greene makes only two objections here, however: that his alleged act was not "manipulative or deceptive" for purposes of Section 10(b), and that it is not barred by subsections (a) and (c) of Rule 10b-5.

> a.   Requirements of Section 10(b)

For purposes of Section 10(b), Greene's alleged acts were concededly not "manipulative."  See Santa Fe Indus., 430 U.S. at 476-77 ("manipulative" is a term of art). Greene argues that his alleged acts were also not "deceptive," and they now appear misleading only because of public misstatements by others (namely, InPhonic).

While typically applied to misstatements and omissions, the statutory term "deceptive" captures all deceptive conduct.  See Stoneridge, 552 U.S. at 158.  And there is much deceptive conduct here, with Greene and Familant spinning out an elaborate plot meant to fool InPhonic's accountants and, in turn, the public.  Greene directed employees to create (and sometimes backdate) credit memos for InPhonic, listing false grounds for the credit.  See Compl., ¶¶ 16, 21, 28.  He sent invoices to InPhonic for fictitious services.  See id., ¶¶ 23, 30, 33.  Unlike in other cases, no innocent business dealings could explain this conduct away.  No matter how accountants recorded them, these transactions would mislead.  Cf. SEC v. Kelly, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011) (concluding that "[t]here is nothing inherently deceptive about structuring a transaction with a counterparty so that the counterparty purchases advertising"). For what it is worth, moreover, many of Greene's alleged acts are written misstatements – a traditional category of deceptive conduct.  See Stoneridge, 552 U.S. at 158 ("In this case, moreover, respondents' course of conduct included both oral and written statements, such as the backdated contracts agreed to by Charter and respondents.").  The acts alleged here, accordingly, are "deceptive" for purposes of Section 10(b).

b.   Requirements of Rule 10b-5

Now on to Greene's primary objection: that the deceptive course of conduct that the

Complaint alleges was neither a "device, scheme, or artifice to defraud" under Rule 10b-5(a) nor

an "act, practice, or course of business which operates or would operate as a fraud or deceit upon

any person" under Rule 10b-5(c).

Greene first argues – repeatedly – that Count I is foreclosed by <u>Janus Capital Group v.</u>

<u>First Derivative Traders</u>, 131 S. Ct. 2296 (2011).  In that case, Janus Capital Management

managed the mutual funds of Janus Investment Fund, a separate legal entity.  <u>See id.</u> at 2299.

Claiming that they were misled by prospectuses issued by the Fund, investors in the Fund sued

Janus Capital Management under Rule 10b-5(b).  <u>See id.</u> at 2300.  Rule 10b-5(b) renders it

unlawful to "<u>make</u> any untrue statement of a material fact" in connection with the purchase or

sale of a security.  Interpreting that language, the Supreme Court held that "the maker of a

statement is the person or entity with ultimate authority over the statement, including its content

and whether and how to communicate it."  <u>Janus</u>, 131 S. Ct. at 2302.  "Under this rule, JCM did

not 'make' any of the statements in the Janus Investment Fund prospectuses; Janus Investment

Fund did."  <u>Id.</u> at 2304.  Janus Capital Management, therefore, was not liable under Rule

10b-5(b).  While <u>Janus</u> forecloses a finding here that Greene violated Rule 10b-5<u>(b)</u> – he

likewise never "made" an untrue statement to investors – neither Rule 10b-5<u>(a)</u> nor Rule

10b-5<u>(c)</u> requires Greene to "make" a statement.  Because <u>Janus</u>'s holding relates only to Rule

10b-5(b), it has no direct application here.

Violations of subsections (a) and (c) are often called "scheme liability."  <u>See, e.g.</u>,

<u>Stoneridge</u>, 552 U.S. at 159-60; <u>In re DVI, Inc. Sec. Litig.</u>, 639 F.3d 623, 643 n.29 (3d Cir.

2011).  At least three circuit courts have held that "scheme liability" is viable only if Rule

10b-5(b) cannot fully cover the deceptive acts – that is, the "scheme" must include deceptions beyond misrepresentations and omissions.  See <u>Pub. Pension Fund Grp. v. KV Pharm. Co.</u>, 679 F.3d 972, 987 (8th Cir. 2012) ("We join the Second and Ninth Circuits in recognizing a scheme liability claim must be based on conduct beyond misrepresentations or omissions actionable under Rule 10b-5(b)."); <u>WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.</u>, 655 F.3d 1039, 1057 (9th Cir. 2011) ("A defendant may only be liable as part of a fraudulent scheme based upon misrepresentations and omissions under Rules 10b-5(a) or (c) when the scheme also encompasses conduct beyond those misrepresentations or omissions."); <u>Lentell v. Merrill Lynch & Co.</u>, 396 F.3d 161, 177 (2d Cir. 2005) ("We hold that where the sole basis for such claims is alleged misrepresentations or omissions, plaintiffs have not made out a market manipulation claim under Rule 10b-5(a) and (c) . . . .").  In this case, as just discussed, the scheme included such deceptions and cannot be fully covered by Rule 10b-5(b).

Greene nevertheless argues that the Southern District of New York's decision in <u>Kelly</u> bars any scheme liability here.  See 817 F. Supp. 2d 340.  In the purported scheme in <u>Kelly</u>, AOL executives structured transactions to inflate the advertising revenue that would be reported.  <u>See</u> <u>id.</u> at 343-44.  <u>Kelly</u> held that "where the primary purpose and effect of a purported scheme is to make a public misrepresentation or omission, courts have routinely rejected the SEC's attempt to bypass the elements necessary to impose 'misstatement' liability under subsection (b) by labeling the alleged misconduct a 'scheme' rather than a 'misstatement.'"  <u>Id.</u> at 343.  Reasoning that it was "AOL's alleged improper recognition of advertising revenue from such transactions[] that is deceptive, and not the act of engaging in such transactions itself," <u>Kelly</u> dismissed the SEC's claims under subsections (a) and (c) "because the SEC's scheme liability claim is premised on a misrepresentation and neither defendant 'made' a misstatement as <u>Janus</u> requires."  <u>Id.</u> at 344.  In

15

other words, because only AOL ultimately "made" the false statement, the executives who

plotted to unleash the false statement could not violate Rule 10b-5.

 This Court is, of course, not bound by <u>Kelly</u>'s holding and, for three reasons, disagrees

with its reasoning and its "primary purpose and effect" test.  First, and most importantly, this

Court cannot square the broad, sweeping language of subsections (a) and (c) – "employ any

device, scheme, or artifice to defraud" and "engage in any act, practice, or course of business

which operates or would operate as a fraud or deceit upon any person" – with the narrow

window for "scheme liability" left open by <u>Kelly</u>.  A "scheme" is "'a plan or program of

something to be done; an enterprise; a project; as, a business scheme, or a crafty, unethical

project.'"  <u>Aaron v. SEC</u>, 446 U.S. 680, 696 n.13 (1980) (quoting WEBSTER'S INTERNATIONAL

DICTIONARY (2d ed. 1934)) (emphasis and brackets omitted).  The scheme, in other words, is the

plan or design, not the ultimate result.  Although elements of the private cause of action under

Rule 10b-5 are judicially created, the Supreme Court has cautioned that courts must apply the

normal rules of statutory construction when interpreting Rule 10b-5's language:

> The concurrence urges us to cast aside our inhibitions and join
> in the judicial lawmaking, because "this entire area of law is
> replete with judge-made rules."  It is doubtless true that, because
> the implied private cause of action under § 10(b) and Rule 10b-5 is
> a thing of our own creation, we have also defined its contours.  But
> when it comes to the scope of the conduct prohibited by Rule
> 10b-5 & § 10(b), the text of the statute controls our decision.  It is
> only with respect to the additional elements of the 10b-5 private
> liability scheme that we have had to infer how the 1934 Congress
> would have addressed the issues had the 10b-5 action been
> included as an express provision in the 1934 Act.

<u>Morrison</u>, 130 S. Ct. at 2881 n.5 (citations, some internal quotation marks, and brackets omitted).

And the text of Rule 10b-5 gives no hint of the cabined interpretation proposed by <u>Kelly</u>.

Second, the Supreme Court has interpreted a statute nearly identical to Rule 10b-5 in a

way that is inconsistent with the interpretation offered by <u>Kelly</u>.  In drafting Rule 10b-5, the SEC

imported language from Section 17(a) of the Securities Act of 1933:

> It shall be unlawful for any person in the sale of any securities
> by the use of any means or instruments of transportation or
> communication in interstate commerce or by the use of the mails,
> directly or indirectly –
>> (1) to employ any device, scheme, or artifice to defraud,
> or
>> (2) to obtain money or property by means of any untrue
> statement of a material fact or any omission to state a material
> fact necessary in order to make the statements made, in the
> light of the circumstances under which they were made, not
> misleading, or
>> (3) to engage in any transaction, practice, or course of
> business which operates or would operate as a fraud or deceit
> upon the purchaser.

Pub. L. No. 73-22, § 17(a), 48 Stat. 74, 84-85 (codified as amended at 15 U.S.C. § 77q(a)).  The

Supreme Court has recognized that those subsections have an "expansive" reach.  <u>United States</u>

<u>v. Naftalin</u>, 441 U.S. 768, 773 (1979); <u>see also</u> <u>Gustafson v. Alloyd Co.</u>, 513 U.S. 561, 577-78

(1995); <u>Naftalin</u>, 441 U.S. at 777-78 ("Although it is true that the 1933 Act was primarily

concerned with the regulation of new offerings, respondent's argument fails because the

antifraud prohibition of § 17(a) was meant as a major departure from that limitation.  Unlike

much of the rest of the Act, it was intended to cover any fraudulent scheme in an offer or sale of

securities, whether in the course of an initial distribution or in the course of ordinary market

trading.").  The Supreme Court, moreover, has warned against using a requirement of one

subsection of Section 17(a) to narrow another:  "Each succeeding prohibition is meant to cover

additional kinds of illegalities – not to narrow the reach of the prior sections.  There is, therefore,

no warrant for narrowing alternative provisions which the legislature has adopted with the

purpose of affording added safeguards."  <u>Naftalin</u>, 441 U.S. at 774 (citation and internal

quotation marks omitted); <u>see also</u> <u>Aaron</u>, 446 U.S. at 697 (similarly "emphasiz[ing] the distinctions among the three subparagraphs of § 17(a)").  Yet <u>Kelly</u> cast subsection (b) in Rule 10b-5's lead role and then crippled subsections (a) and (c) to ensure that they would never overshadow the star.

Third, and finally, the canons of statutory interpretation normally needed to justify limiting the scope of one subsection based on another – the surplusage canon and the general/specific canon – do not apply here.  "It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant."  <u>TRW Inc. v. Andrews</u>, 534 U.S. 19, 31 (2001) (internal quotation marks omitted).  Subsections may (and inevitably do) overlap, but the surplusage canon is invoked only when the intersection of subsections becomes so great that one subsection renders another meaningless.  In Rule 10b-5, a set of facts may involve both a misstatement (or omission) that violates subsection (b) and a scheme that violates subsections (a) and (c).  As long as <u>some</u> misstatements (or omissions) covered by subsection (b) remain outside the grasp of scheme liability under subsections (a) and (c), however – and some clearly do – there is no surplusage in the language of the regulation.

Next, the general/specific canon holds that if "a general authorization and a more limited, specific authorization exist side-by-side," then "the specific governs the general."  <u>RadLAX Gateway Hotel, LLC v. Amalgamated Bank</u>, 132 S. Ct. 2065, 2071 (2012) (citation omitted).  Here, however, a "scheme" is not more general than a "misstatement" or "omission"; they are simply different types of conduct.  In any event, neither canon could apply here because Rule 10b-5 has no apparent ambiguity.  <u>See</u> <u>Conn. Nat'l Bank v. Germain</u>, 503 U.S. 249, 253-54 (1992) ("[C]anons of construction are no more than rules of thumb that help courts determine the

meaning of legislation, and in interpreting a statute a court should always turn first to one, cardinal canon before all others.  We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.  When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete.") (citations and internal quotation marks omitted).

In a final protest, Greene points to Stoneridge, where the Supreme Court dismissed a claim with allegations that echo those here.  See 552 U.S. 148.  In that case, Scientific-Atlanta sold digital cable converters to Charter, a cable operator.  See id. at 154.  Scientific-Atlanta and Charter allegedly agreed that Charter would overpay $20 for each converter and Scientific-Atlanta would return the overpayment by buying advertising from Charter.  See id.  Because Charter could capitalize the converters but record the advertising payments as revenue, the arrangement improved Charter's financial statements.  See id.  To hide their arrangement, Charter and Scientific-Atlanta fabricated documents and backdated contracts.  See id. at 154-55.

Stoneridge was a private action, however, brought by investors who lost money on Charter stock and sued Scientific-Atlanta – not an SEC enforcement action.  The Court, notably, ruled that the investors failed to prove an element unique to the private action – reliance.  See id. at 161 ("[W]e conclude respondents' deceptive acts, which were not disclosed to the investing public, are too remote to satisfy the requirement of reliance.  It was Charter, not respondents, that misled its auditor and filed fraudulent financial statements; nothing respondents did made it necessary or inevitable for Charter to record the transactions as it did.").  That ruling, of course, has no effect on the SEC's enforcement action here.

Stoneridge, in fact, seems to buttress the SEC's cause in this case.  The Court suggested that the conduct in Stoneridge (and, thus, the similar conduct here) was "deceptive" within the

meaning of Section 10(b).  See id. at 158, 161.  And although it worried about transforming Rule

10b-5 into a private federal cause of action against corporate malfeasance, the Court recognized

that the SEC could reach such conduct:

> Petitioner invokes the private cause of action under § 10(b)
> and seeks to apply it beyond the securities markets – the realm of
> financing business – to purchase and supply contracts – the realm
> of ordinary business operations.  The latter realm is governed, for
> the most part, by state law.  It is true that if business operations are
> used, as alleged here, to affect securities markets, the SEC
> enforcement power may reach the culpable actors. . . .  Were the
> implied cause of action to be extended to the practices described
> here, however, there would be a risk that the federal power would
> be used to invite litigation beyond the immediate sphere of
> securities litigation and in areas already governed by functioning
> and effective state-law guarantees.  Our precedents counsel against
> this extension.

Id. at 161 (emphasis added).

Subsections (a) and (c) of Rule 10b-5, in sum, use broad language, and the text of the

Rule and the Supreme Court's precedents offer no justification for limiting the natural reach of

that language.  That is not to say that the SEC can apply or expand Rule 10b-5 without limits;

indeed, Section 10(b) sets an outer boundary on how far Rule 10b-5 can go.  To violate Rule

10b-5, the violator must employ a "manipulative or deceptive device or contrivance."  Rule

10b-5, similarly, cannot by itself create secondary liability for aiding and abetting; all direct

enforcement actions must be for primary violations of Section 10(b).  (As set forth on pp. 8-9,

*supra*, if the SEC wishes to prosecute aiding and abetting, it must do so under Section 20(e), as it

does here.)  For private actions under Rule 10b-5, moreover, plaintiffs must prove the additional

elements of reliance, economic loss, and loss causation.  And Stoneridge makes reliance a tall

hurdle in most cases of scheme liability.

The Complaint here alleges a "scheme . . . to defraud" that falls within Section 10(b) and

Rule 10b-5(a).  As the scheme goes beyond mere misstatements and omissions, it satisfies the

limits on scheme liability imposed by some courts of appeals.  Count I thus survives the Motion

to Dismiss.

### 3.  Motion to Dismiss Count II

Greene also moves to dismiss Count II, which alleges under Section 20(e) that he aided

and abetted Familant's and InPhonic's violations of Section 10(b) and Rules 10b-5(a) and (c).

Greene's challenge to Count II, however, hinges on his challenge to Count I: for the same

reasons that Greene claims that he never himself committed a primary violation – *i.e.*, there is no

scheme liability – Greene claims that Familant never committed one either.  Thus, he argues,

there was no violation for Greene to aid and abet.  The Court has already considered Greene's

argument on this point and rejected it.  Count II therefore survives the Motion to Dismiss as well.

### 4.  Motion for Summary Judgment on Counts I and II

Greene next moves for summary judgment on Counts I and II, claiming that his alleged

scheme was not "material" for purposes of Section 10(b) and Rule 10b-5.  A scheme is material

if its disclosure "would have been viewed by the reasonable investor as having significantly

altered the total mix of information made available."  Basic, 485 U.S. at 231-32 (internal

quotation marks omitted).  So, to prevail on summary judgment, Greene must show beyond

genuine dispute that a reasonable investor would not have viewed disclosure of the scheme as

significantly altering the total mix of information available.

Greene points out that, throughout 2006, InPhonic made pervasive accounting errors that

significantly affected its publicly filed financial reports.  For example, InPhonic originally

reported an annual net loss of $17.5 million, but revised that net loss to $63.7 million.  See

Compl., ¶¶ 42, 44.  With such huge errors, Greene says, the APC credit scheme was a drop in the

bucket – not something a reasonable investor could have viewed as significant.  Greene points

out, moreover, that the $7 million difference attributed to his scheme would inflate restated net losses by only 11%.  He cites a smattering of cases from the last quarter century that have found changes between 0.3% and 2.6% in various line items to be immaterial.  <u>See</u> Summ. J. Reply at 17.

At the outset, the Court can find no reason to look at the restated numbers instead of the original ones.  <u>Basic</u> directs focus to the "total mix of information made available" – which would seem to be the information available at the time (*i.e.*, the original filings), not the corrected information (*i.e.*, the restated filings) available only for hindsight viewing.  In any event, even accounting for InPhonic's penchant for accounting mistakes, the Court cannot say that an 11% rise in annual net losses is immaterial as a matter of law.  The cases that Greene cites present a dog that doesn't bark; the change here is more than four times larger than the change at issue in his best precedent.  The scheme's supposed immateriality therefore does not entitle Greene to summary judgment on these two counts.

B.  <u>Reporting Provisions and Books and Records Provisions: Counts III, IV, and V</u>

Counts III, IV, and V involve reporting and recordkeeping requirements under Section 13 of the Exchange Act.  The first two are for aiding and abetting, while the third is for a direct violation.

1. *Motion to Dismiss Counts III and IV*

Count III alleges that Greene aided and abetted InPhonic's violations of a fistful of reporting provisions – Section 13(a) and Rules 12b-20, 13a-1, 13a-11, and 13a-13.  Section 13(a) requires every "issuer" of registered securities to file with the SEC any annual reports, quarterly reports, or information and documents that the SEC requires.  15 U.S.C. § 78m(a).  Implementing that requirement, Rules 13a-1 and 13a-13 command issuers of registered securities

to file annual (Form 10-K) and quarterly (Form 10-Q) reports.  See 17 C.F.R. §§ 240.13a-1, 240.13a-13.  Rule 13a-11 directs issuers to file current (Form 8-K) reports.  See 17 C.F.R. § 240.13a-11.  All of those reporting requirements "are satisfied only by the filing of complete, accurate, and timely reports."  SEC v. Savoy Indus., Inc., 587 F.2d 1149, 1165 (D.C. Cir. 1978) (citation omitted).  Rule 12b-20 adds a related obligation:  "In addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made[,] not misleading."  17 C.F.R. § 240.12b-20.

Count IV, in turn, alleges that Greene aided and abetted violations of Section 13(b)(2)(A).  That recordkeeping provision requires every "issuer" of registered securities to "make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer."  15 U.S.C. § 78m(b)(2)(A).

For these two counts to survive, InPhonic (the issuer) must have committed primary violations of each statute or regulation, and Greene must have substantially assisted each of those violations while acting with scienter (i.e., knowledge of the primary violation and knowledge that his conduct would assist the primary violation, or recklessness as to those facts).  See 15 U.S.C. § 78t(e); Graham, 222 F.3d at 1000.

In his Motion, Greene argues that the Complaint falls short on substantial assistance and scienter.  Although he never questions InPhonic's alleged primary violations, the analysis must still begin with that unchallenged element.  For each statute and regulation, InPhonic's alleged primary violations are multiple false statements about its finances.  (This is a shift from Counts I and II, where the primary violation was the fraud, not the public and internal misstatements.)  The SEC focuses on InPhonic's reports (and records) of net loss and EBITDA.  The statements

23

are false because InPhonic recorded the APC credits as reductions of expenses, even though InPhonic had to repay those credits.

The SEC's allegations of substantial assistance appear sufficient.  According to the Complaint, Greene created (or ordered the creation of) the credit memos that the accountants wrongly booked.  He took various steps, moreover, to ensure that the credit memos would not raise suspicions with accountants, including listing false justifications for the credit award.  And he rigged the repayment of the credits in a way that prevented InPhonic's auditors from discovering the obligations offsetting the credits.  Greene was therefore more than a marginal player.  Contrary to his protests, he need not help create InPhonic's financial statements in order to "substantially assist" its violations.

More clearly, the SEC's allegations of *scienter* are sufficient.  According to the Complaint, "Greene at times showed [an] APC Employee the portion of InPhonic's financial statements relating to cost of goods sold and explained that the APC credits helped improve InPhonic's performance."  Compl., ¶ 29.  That allegation shows that Greene both knew of the primary violations and knew he was assisting their commission.

These allegations show that Greene "in some sort associated himself with the venture, that [he] participated in it as in something that he wished to bring about, and that he sought by his action to make it succeed." Apuzzo, 689 F.3d at 212 (citation and brackets omitted).  Counts III and IV thus will not be dismissed.

2. *Motion to Dismiss Count V*

In Count V, the SEC alleges that Greene directly violated Rule 13b2-1:  "No person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to section 13(b)(2)(A) of the Securities Exchange Act."  17 C.F.R. § 240.13b2-1.  The referenced

Section 13(b)(2)(A), discussed above, covers the "books, records, and accounts" of every "issuer" of registered securities.

Greene protests this Count only briefly, claiming that he cannot violate Rule 13b2-1 because he did not control, supervise, or even participate in making InPhonic's records. The Rule's text, however, is not limited to employees in direct contact with InPhonic's records – it applies to <u>every</u> "person." <u>See</u> Promotion of the Reliability of Financial Information and Prevention of the Concealment of Questionable or Illegal Corporate Payments and Practices, Exchange Act Release No. 15,570, 16 SEC Docket 1143, 1151 (Feb. 15, 1979) ("The effect of falsifications of books, records or accounts, in making reports required under Section 13 misleading or incomplete, is not necessarily contingent on the identity of the wrongdoer or on whether he acts with the knowledge or acquiescence of management. Moreover, while normally only officers and employees of the issuer are in a position to falsify corporate records, it is not feasible to identify in the Rule [13b2-1] all categories of persons who might violate it. Consequently, the Commission believes that the rule should apply to any person who, in fact, does cause corporate books and records to be falsified."). Although Section 13(b)(2)(A) imposes requirements only on issuers, the SEC claimed power from other statutes in promulgating Rule 13b2-1, <u>see</u> <u>id.</u> at 1149, and Greene raises no questions about the Rule's validity. Given Greene's purported hand in the credit memos and fabricated invoices that led InPhonic to file false records, the SEC has sufficiently alleged that Greene indirectly caused InPhonic's books and records to be falsified. Like the other counts, Count V may thus proceed.

C. <u>Summary Judgment on All Counts</u>

In a final bid to defeat the entire case, Greene argues that he is entitled to summary judgment on all counts because InPhonic recorded the credits correctly.

Greene's primary argument on this point is somewhat involved:  InPhonic's financial statements would have been correct if APC had given InPhonic the credits unconditionally. What allegedly makes the credits conditional – and thus allegedly makes the financial statements erroneous – is Familant and Greene's agreement that APC would recoup the credited amount. According to Greene, however, the Generally Accepted Accounting Principles would require deferred recognition of the credits only if the recoupment agreement was binding, and he contends that the agreement here was not.  As Greene points out, the APC credit agreement was oral, vague, and omitted key terms.  Each of these traits, he argues, made the agreement unenforceable.  Closing the loop, he thus argues that InPhonic recorded and reported exactly what it should have.

The SEC disagrees, however, and submits an expert report that disputes Greene's analysis of GAAP.  The SEC's expert says that GAAP prohibited InPhonic from recording the credits as it did because the credits themselves were illegitimate.  See Summ. J. Opp., app. (Decl. of Greg J. Regan), ¶¶ 23-29.  He asserts that the credits did not actually enhance InPhonic's financial position and thus did not reduce expenses.  Allowing these credits to be recorded as reductions to expenses without noting InPhonic's offsetting obligation, he says, would elevate form over substance, in violation of GAAP.  See id.  At this stage, the Court must "eschew making credibility determinations or weighing the evidence."  Czekalski, 475 F.3d at 363.  The SEC's expert entrenches a genuine dispute about the propriety of InPhonic's accounting for the credits.

Alternatively, Greene claims that InPhonic made an independent error in accounting for the credits: he says that the credits were consistently booked in the wrong quarters.  Even if true, however, Greene offers no explanation for why one accounting error would cancel out another.

26

All counts therefore survive the Motion for Summary Judgment.

**IV.      Conclusion**

For the aforementioned reasons, the Court will deny Defendant Greene's Motion to Dismiss the Complaint, or, in the Alternative, for Summary Judgment.  A separate Order consistent with this Opinion will be issued this day.

*/s/ James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  <u>December 19, 2012</u>